Case No. 17-1238 at L. Midwest Terminals of Toledo International, Inc. Petitioner v. NLRB, Midwest II. Case No. 17-1239 at L. Midwest Terminals of Toledo International, Inc. Petitioner v. NLRB, Midwest III. And Case No. 18-1017 at L. Midwest Terminals of Toledo International, Inc. Petitioner v. NLRB, Midwest I. Mr. Solembic for the Petitioner, for the Respondent, NLRB. Ms. Ledczkowski for Midwest I, Ms. Beard for Midwest II, and Ms. Johnson for Midwest III. Good morning. May it please the Court. Petitioner Midwest maintains that the Board's decisions in all three matters are not, excuse me, are irrational, arbitrary, and not substantially supported by the record evidence. In Midwest I, the Board made a ruling with respect to due checkoff, which was also a violation of Midwest due process rights. The one and only theory tried in Midwest I was whether or not Midwest violated WKYC-TV, meaning there was an expired contract and was Midwest required to continue due checkoff until a new contract was agreed to or a valid impasse was reached. Midwest maintained that it had given notice to the union and the union waived its right to bargain. And Midwest also argued that WKYC-TV would be ruled invalid by the Supreme Court in no canning because the Board had an invalid point. That came to pass and the Board ruled after briefing was completed that it was no longer relying upon WKYC-TV because they couldn't because it had been ruled invalid. So at that point, the Board came up with an alternative theory of midterm modification. In that case, excuse me, that theory was not fully and fairly litigated and Midwest was never on notice during the case that that was an alternative theory of the Board. Also... What is your view of what that MOU is? Was it an independent agreement between the parties? Was it a modification of the collective bargaining agreement as between these two parties? What do you consider it to have been? So my understanding of the MOU was that they were taking a portion of dues out and they had changed their regular dues versus some other type of dues, and I apologize because I don't have a memorandum of understanding in front of me, but that it was not anything that would supersede the expired contract in place. Well, it specifically substituted in a new provision. It says that we're taking out the box that is in the CBA or the paragraph in the CBA and replaces it with new language. It does say that. Right. But it was also never litigated during the trial. Right. I'm just asking you what your position is because it says you're going to replace the current language about check-offs from the CBA with new language. So I'm just, again, trying to understand that this is separate and apart from your point just to understand what this document is. Do you understand it to be an independent agreement? It doesn't have anything to do with your points about the process. Reserving all of those, an independent agreement or an amendment of the CBA? Okay. My understanding was that it was an amendment of the CBA, not an agreement in and of itself. So when the CBA expired, it expired with it? Correct. The next issue in Midwest I was Mr. Brown's reduction of hours in June, excuse me, June, July, August of 2008. The board maintains that Mr. Brown's hours were reduced in June, July, and August because of a threat he made in May to file a grievance. Because of an actual grievance he filed on July 22nd. Because of an actual grievance he filed on August 1st and another grievance on August 8th. If you look at Mr. Brown's hours, May was one of his, excuse me, May was his second highest month of the year. So the board is saying he discriminated against Mr. Brown because he threatened to file a grievance on May 9th. Yet, after that date, he worked, I believe it was nine more days or seven more days for a total of 61 hours. More than half of the hours he worked in May. Admittedly, his hours are down in June, July, and August. The record evidence shows that. But if you look into the gate log records. Is June, July, and August the busiest time of the year? Summer is generally the busiest time of the year. You said generally. Was there something unusual about that year or was it? Well, there was an economic downturn in that year. Part of the issue in that first case was whether or not we were hiring enough people in April and May. And due to the economic downturn in 2008, we weren't hiring as many people as we normally did. And we won that issue. I believe there was evidence about how many shifts came in as opposed to the years prior. And it was significantly reduced. And also, if you look at the record, of the 91 days. Does that record show that all other employees of his equivalent seniority and position on the employment list also had hours reduced? Were his hours similar to what everyone else was getting that summer? Based upon the record evidence, yes. Because if you look at the records in June, July, and August, of the 91 days, there was only 14 days where someone potentially below Mr. Brown was hired. Of the remaining days, Midwest only hired people from the skilled list. And Midwest only hired the top person from the regular list. You're talking about how many people you hired. I'm talking about how many hours of the people that were working worked in those months. Is that in the record? The people working those hours. Are you saying we should have hired more people? Is that your question? No. My question is, so your argument is, as I understand it, yes, his hours were down. You just can't dispute that. His hours were down in June, July, and August. But it was a rough year economically. You didn't have as much work as you normally would. That's why you weren't hiring very far down into the list. And so what I'm asking is, well, there were other people that were working in June, July, and August that were above him on the list, or equivalent to his position on the list, or on the skilled list. What hours were they working? Were they also working similar? No, they would have been working because they're being hired to get work done. The work that needs to be done, they're getting hired to get it done. So if I'm hiring eight people from the skilled list and one person from the regular list, they're working the amount of hours necessary to get that work done. If they need to hire more people on the regular list, Otis, as he was, Mr. Brown, was hired, and so were others below him. So it depended on the amount of work that came in. No. What do you say specifically was the error committed in deciding that issue by the board? Of his reduced hours? Yeah. What we're saying is the board is arguing that he threatened to file a grievance in May, so we didn't hire him in June, July, and August. And what we're saying is, quite frankly, that doesn't make sense. Well, are you saying that there was not evidence in which they could have made that conclusion? So we don't care if it makes sense or not, as long as it isn't arbitrary capricious and there's substantial evidence. If you look at the record of evidence, there's only 14 days out of 91. 14 days out of 91 that Otis potentially was passed up. So what you're saying is that there's not substantial evidence to support the board. Correct. And we don't have to decide whether they're right or wrong. Correct. The last issue in Midwest one that I want to discuss was the issue of latches. ALJ personally admitted in his decision that Midwest was prejudiced because it had lost two key witnesses. One of those witnesses, Mr. Stoller, was part of the hiring process in 2008. He also would have been a key witness when Mr. Brown, the incident that occurred in November, when the board argued that we once again discriminated against Mr. Brown in November based upon grievances that he filed. Mr. Stoller was not available to corroborate Mr. Leach's testimony. Well, Mr. Moody was. He was a participant to the same conversation, confirmed Mr. Stoller's words. So how was it prejudicial not to have Stoller there when you had Moody there? Mr. Stoller didn't make any remarks that I'm aware of. Moody came in and agreed with the statement. No, this was – I'm talking about November now. Oh, okay. Okay. So in November is when Mr. Brown was on light duty, and Mr. Brown argued that he worked the day before, and he was not hired the next day, and it was discriminatory that he wasn't hired, and the board argued that Midwest's reasoning was pretext. The board argued that Terry Leach instructed Mr. Brown that he couldn't hire him because he talked to Mr. Brown's doctor, and the doctor said his injury was more serious than he led on to believe. That was false? Correct. The board said that that was pretext. Mr. Leach's not making that statement. Mr. Stoller was present. He was not able to corroborate Mr. Leach's testimony. And then the board uses that animus finding in two other cases. So, again, whether the board – my understanding is there is no absolute bar on latches. The board has not come out and said we will never consider latches. Did you raise it on remand? We did not raise it on remand. Well, then it's forfeited. It is not forfeited, Your Honor. They asked us to file a position statement. It was not mandatory that we file a position statement. No one said if we do not file a position statement, we would have waived any arguments. This court did not vacate our arguments. This court vacated the board's decision. Which means it's a clean slate. Again, the board did not mandate that people file a position statement. So, under that theory, had MIDWED not filed a position statement, we would have waived all arguments. Did you file a position statement? We did. What did you raise in that one? Did you raise brand new stuff or did you raise arguments you had raised before? I believe we raised arguments that we had raised before. So is the selective omission relevant? I don't believe so, Your Honor. What is the point of raising some things that you raised before but not others? Your Honor, I can't answer that question. I can't. Sorry. In Midwest 2, the main issue was Mr. Brown's discharge as well as the aluminum calcium transfer. Again, the board ruled that Otis Brown was discriminately treated because he was fired on a first offense as opposed to others who were given warnings on a first offense for equipment damage. And that's simply not accurate. One other person had been terminated for damaging company equipment and or company property, Mr. Victorian Sr. Mr. Victorian Sr. had three incidents in a 19-and-a-half-month period, and on that third incident, he was terminated. Mr. Brown had three incidents in a 14-and-a-half-month period, and he was terminated on that third incident. The board doesn't recognize the other disciplines issued to Mr. Brown in 2012. Are there any questions of Mr. Victorian's responsibility for the accidents that he committed in that time period? Was there any questions of his responsibility? No. He didn't bring that up? No. No. No, we don't have to prove whether... He broke right into the pole and nearly knocked it over. Correct. The rule says we don't have to prove whether or not the damage was intentional or not. No, no, no. I'm just asking the question. So, in this case, there ended up being a substantial question about whether Mr. Brown was responsible at all. So, saying it was the third incident in a time period really doesn't grapple with the central problem, which is pressuring the preliminary report to include a statement about liability, which preliminary reports aren't supposed to do because they're preliminary, and then ignoring the final report, which actually showed a flaw in the machinery. First, there was no evidence whatsoever by the board that said anyone was pressured into putting anything in the report. Has that never been asked before? Are you disagreeing with the board's finding on that? I'm disagreeing with the fact that someone from management instructed Mr. Jones, the maintenance person, to instruct the RICO technician to put that in there. I'm also, if you, again, the RICO technician said he didn't put anything in there that wasn't true. So, yes, at his initial report, there was nothing that he saw that led him to believe it was anything to do with the operator. You've got to agree, the final report was quite different. The final report was different, but the final report also... Well, why wouldn't anybody take the final report into its decision-making on termination? Maybe it wasn't their fault at all, but that wasn't considered. Mr. Groeg, in his final report and on testimony, nothing in that changed his opinion that Mr. Brown knew or should have known the damage he was causing to that equipment. What evidence was there? What evidence was there? I mean, that was his testimony. I'm saying at the time that his company, not a testimony that happens years later, but at the time the company made its decision, or would have made its decision had it done a reasonable investigation, asked Mr. Brown, did you feel anything? The company did ask Mr. Brown. Did you feel anything? There's no statement from Mr. Brown. Mr. Brown decided not to issue a statement. Mr. Brown was given four days to issue a statement. The evidence is he was given time to issue a statement, but he didn't do so. Correct. And the final report, did it come in before or after the termination? My understanding is the final report, based on the date, would have come in after the termination. Again, Mr. Lee... How long was it between the preliminary and final report? I don't know. Two to three weeks, maybe. And is the company in the habit of firing people before it has a final report on accidents? The company believed it had... Where someone denies responsibility? I'm just asking what the company's practice and policy is in this area. Lots of people deny responsibility, that they've done something wrong. Mr. Leach is an experienced unloader driver, certified by the Howard Department of Transportation. I didn't ask you the facts. I'm just saying, if that's what the company does, maybe it just fires people as soon as they get a preliminary report. I'm just asking what they normally do. There was a five-day window between the incident and when Mr. Brown was terminated. Mr. Leach spoke with Mr. Brown. Mr. Leach spoke with Mr. Leach. I'm going to try one more time. Because you get preliminary reports and you get final reports. Correct. Okay. Is the company usually making the termination or discipline decisions based just on the preliminary report, or does it usually wait for the final report? This is the first time the company asked RICO to do a report so it would not be accused of discriminating against Mr. Brown. The company usually does its own investigation. Does it usually complete its investigation before it makes disciplinary decisions? Does it usually complete its investigation? Based upon the information that I have, once they've spoken to the witnesses, they will make a determination on whether or not someone should be fired. Is that a complete investigation? That would be a complete investigation. They usually wait for a complete investigation. Correct. And they spoke with Mr. Brown. I'm a little confused. What does it mean to discharge Brown? He only worked. In the briefs we get, the setup is that somebody is not an employee unless they're hired on a day-to-day basis. They have to show up and then they get fired? Correct. Okay. So what does it mean that he was discharged? It means they just don't hire him? Is that it? If they get discharged, they lose their privilege to show up to the front. This is a gated facility. So they lose their privilege to enter the facility. So he would no longer be- His name would be given on the list anymore. He's not on the list anymore. Correct. He's crossed off the regular list. Yes. Or the casual. He just can't show up. Correct. Okay. Now with respect to the aluminum and calcium, there is a proviso in the board's 10-K decision. And that's what the parties are arguing over. So everyone understands that the facility is divided into half by a road going down the middle. On the wet side, the union, ILA Local 1982, loads and unloads the barges, stores, banks, and warehouses on the wet side. On the dry side, the Teamsters unload, transport cargo, store cargo in the warehouses. At the time of the 10-K hearing, the ILA Local 1982 was attempting to force Teamsters off of the property altogether. They were seeking to take over their work on the dry side. At the time of the hearing, we admitted the notice and the entire facility was up for grabs as far as who does what work. And the board kept things as they were as far as the dry side and the wet side. But did say for items, for material that is to be stored on the dry side, the Teamsters are permitted to enter the wet side and transport the cargo back because they have done this work in the past. Now they have done this work in the past two different ways, via transfer truck and via forklift. So on items, be it aluminum... Did they use forklifts at the time of the 10-K hearing? Were those issued in the 10-K hearing or was that a subsequent development? The 10-K hearing dealt with past practice. So there was testimony of how was this work done in the past, how is it currently, and how is it currently being done. It's currently being done by a third-party transfer truck. Was that in the past been done by forklift? It had in the past been done by forklift and by transfer truck. So Midwest read that to mean that the Teamsters could enter the wet side, stick their forks in the aluminum, and transport the cargo back without having the inefficiency of waiting for ILA to load a truck, drive the truck over and unload the truck. It's unnecessary work. Now, with respect... On page 40 of your brief, you've got the determination of dispute, but the introduction to that is that the Teamsters, the people represented by the Teamsters Union, is being awarded the work that was being performed by the trucking company. Correct. The trucking company did not use forklifts to transfer... Correct. And if you... Correct. So if the award is to the Teamsters to perform the work previously done by the trucking company, that says nothing about transporting through a forklift. It also doesn't say that they can't transport it with a forklift. If you go to the proviso lower, lower in the dispute where it says, the Teamsters are permitted to enter the wet side and transport cargo back that is to be stored. And again, during the 10K hearing, one of the things that was discussed was efficiency. We're trying to get rid of having to use a truck when we don't need one. The loading was awarded to the local union. Correct. Not to... And if transfer trucks are used, just as in calcium, they still load. The loading, right. But the forklift is eliminating that. It has them doing the loading. They load and transport. That's what the forklift does. It self-loads. The forklift isn't... The forklift is just transporting. I mean, you're literally sticking your fork in and bringing it back. You're not loading it. You're sticking the fork, loading it on the forklift. Well, it's different than loading it on a truck. I get it's different, but it's loading, right? I don't think so. I questioned that. I'm sorry to interrupt. The forklift just picks it up and takes it where it's going. It doesn't load it on something. No, I get that, but you're loading it onto the forklift. No. You take the forklift and you pick it up with the forklift. That's the point. There's not an act of loading like you have with a truck where your forklift or your steel door actually is picking something up and loading it on another item. The forklift... My daddy used to teach forklift driving, by the way. But anyhow, the forklift just simply pokes into the load and lifts it up. It doesn't load it on anything. You take it where it's going. Well, the forklift... The driver loads the forklift and then takes it... What form is the aluminum in? The aluminum are in... They're called sows, sows. And they are probably from here to here. Are they on pallets? They're not on pallets. They're just stacked on one top of each other. You just stick the fork in the bottom one, transport it to the other side. You don't even have a pallet on the bottom? Excuse me? You don't even have a pallet on the bottom? No. No. And then the last item I want to discuss is the calcium. So there was another issue with respect to Big West... Excuse me. The ILA Local 1982 sealant doors unloaded the barge of calcium, loaded it onto a transfer truck. That transfer truck transported it to the dry side, and the Teamsters unloaded it and stored it in warehouses. So in that instance, Midwest is doing precisely what the board argues it should be doing, and we still violated the act. So it's got to be one thing or the other. And I am in my rebuttal time, so if there are no more questions, I will reserve the remaining time. Did you want to raise anything about Midwest 3? I would love to, but I'm running very low on time. We'll give you some time to rebuttal. Okay. Make it efficient. Correct. On Midwest 3, the main point is no one argues that Mr. Canales is qualified to be on the skill list. No one argues what? No one argues that Mr. Canales has the necessary qualifications to be on the skill list. He's good. He's been added to the skill list. The issue is, is Mr. Russell qualified to be on the skill list, and is Mr. Victoria Jr. qualified to be on the skill list, and then there's another Mr. Victoria Jr. qualified to be on the skill list. Midwest maintains that Joe Victoria Jr. is qualified to be on the skill list. He meets the necessary qualifications. He is a hatch leader. He is a crane operator. He is a signalman, and he is a power operator. Now, there's issues to whether or not he is actually a signalman because it is not listed on the order of call as him being a signalman. But if you look and if you read the briefs, you can't be a crane operator unless you're a signalman. Mr. Victoria Jr. is a crane operator. He is qualified as a crane operator, and no one disputes that. He is a signalman. Mr. Fred Victoria Jr. and Mr. Russell are not qualified signalmen. They took the test. They failed the test. And per OSHA, once the company has knowledge that someone is not capable or qualified to perform that work, they are no longer qualified to perform that work until they pass the test. That is why they were not added to the skill list. And as far as discrimination with Mr. Victoria goes, the company has consistently stated since 2012 that he is not a qualified signalman because he did not pass the test. I'm not sure that there is an answer to this, but it looked to me like, looking at the briefs and records, that you don't have an awful lot of people who can be trained crane operators. It's the work that's not getting done, or you have enough people on that skill list to do this job. The company is in desperate need of crane operators. Okay. And still are. So I guess the short answer is you must be paying a lot of overtime, or... I can't answer that. I just know that the company desperately needs crane operators. But there are no other questions I'll reserve the remaining time for. All right. Thank you. Thank you. Excuse me for jumping in there. No, sure. You're not lucky if you do speak English. You never were a conspirator. May it please the Court. My name is Milakshmi Rajapaksa. I'm counsel for the National Labor Relations Board. On the first case in the chronological series of Midwest terminal cases that are before the Court today, with me from the Board, I'm seated at counsel table, are Heather Beard and Rebecca Johnston, who will argue respectively Midwest 2 and Midwest 3. I'm here to address Midwest 1. I understand that Midwest's counsel has only addressed a few of the unfair labor practices that are at issue in this case. I would just briefly like to remind the Court that there were seven unfair labor practice findings the Board made in Midwest 1. The company forfeited any challenge to four of the violations by failing to argue them in the opening brief. And so what we're left with are two discrimination findings and one finding of an unlawful cessation of dues checkoff, which is deduction of union dues from employees' paychecks and remittance of the dues to the union. So taking up the issue of dues checkoff first, since that is what my opposing counsel chose to do, I'll just say the face of the document, Judge Millett, is quite clear. The parties in 2012, and this is at page 890 of the jury appendix, the parties agreed that the current language on checkoff will be replaced with the proposed language, and then the proposed language is set forth. So it's an amendment to the collective bargaining agreement. It wasn't characterized as an amendment to the master agreement. The current language will be replaced with this language. It sounds to me like an amendment of the collective bargaining agreement, not a freestanding agreement. Well, the Board's position is that this is a freestanding agreement. How can that be? The current language, and then it produces a current language, will be replaced with the new language. Right. But I guess what I'm... It's building into a preexisting, some bigger document, the collective bargaining agreement, that this is substituting new language in for. Right? That's the natural reading. Right. Right. That's true, Your Honor. I guess what I'm saying, though, is that this agreement also had a separate durational clause in it. Where does it say that? And so it says, it says, Until Island Local 1982 and Midwest Terminals ratify a new local agreement. So that is a, this agreement is freestanding in the sense that it is not subject to the durational provision in the master agreement. The master agreement was... It just says, until we get a new bargaining agreement, the current bargaining agreement language, checkoff number four, will be replaced with checkoff number four. It doesn't actually put into the collective bargaining agreement language about this particular, this one topic will continue after the rest of the collective bargaining agreement expires. Your Honor, the board's reading of this is that it does, it does, this agreement continues in effect by a plain term until a new local agreement is ratified. And so at the time when Midwest ceased checking off union dues, there was no new successor agreement that had been executed. So by the plain terms of this MOU, Midwest was obligated to continue checking off dues, and it very simply ceased doing that. So the violation itself is quite clear, and I don't think Midwest's counsel today even has a coherent explanation as to how that came about. Is there in the complaint against which they were defending language that says that this was the nature of the violation? As I understand the position, it's just that the complaint did not put them on the due process, as far as I know, there were crimes due under something other than what they were charged with. Right, that is Midwest's argument. Yeah, and why aren't they correct? Well, they're not correct because under this Court's precedent and under Pergament, which is one of the cases, an out-of-circuit case, which is the main case in this area, the Board does not have to exhaustively plead every theory that could possibly apply. Well, they may not have to exhaustively plead every theory that could possibly apply, but don't they have to plead the theory upon which they found a point? Yes. If you can't defend against something you're not charged with, why isn't there a due process problem? Well, the Board broadly did plead a refusal to bargain, and it pleaded the underlying facts that formed the basis for that allegation, and that is all that the law requires in the Board's view. Hang on, hang on, because the legal issue was whether if you're proceeding under a collective bargain agreement, if there had never been an MOU, then there was this legal argument about whether the checkoff obligation continued once the collective bargain agreement expired. Right. And so by pleading that theory, that's very different from saying whatever that legal world is, there's a whole other contractual obligation that requires you to depart from that existing Bethlehem Steel precedent And you alone had to keep paying dues. You had agreed to keep paying dues even after the collective bargaining agreement expired. They had no notice that the memorandum of understanding was an issue, that that was the Board's reading of this document, or any opportunity to fight about those facts and those legal arguments. The Board... What did you? Well, respectfully, Your Honor, the Board disagrees with that reading of the record, because on this record, there's not only the broad terms of the complaint, which did set forth the refusal to bargain and the basis for that allegation. It also... Did the complaint mention the memorandum of understanding? No, but the complaint didn't have to mention the evidence in particular. And at the hearing, it was actually... Did it have to reference the source of the legal obligation? Well, the complaint didn't mention anything. Quite frankly, if Section 8B of the Act is what sets forth the scope of the duty to bargain, the complaint didn't say anything about Section 8B, and yet Section 8B is in play regardless of whether you have a unilateral change or a contract modification. And so, by Your Honor's suggested standards, the complaint wouldn't be complete, even as to the unilateral change. But in this case, if I may return to the issue of notice, Midwest had not only the terms of the complaint, but they also had a statement from counsel, albeit at the very beginning of the hearing, that Midwest ceased shut off at a time when it was contractually bound, as well as legally bound, to continue checking off dues. And then there was also the fact that this MOU came into evidence over no objection... Did the general counsel think it was litigating this issue before the board came up with it? In all honesty, did the general counsel's office believe it was asserting this issue and litigating this issue? Or were they just going back in time and trying to find something that kind of suggested it was in play? Yes, I understand, Your Honor, that that's Midwest speculation. There is some speculation about the board's motive. But regardless...  I'm asking, when the general counsel prosecuted this case before the ALJ and again before the board, can you tell me that the general counsel was consciously litigating the theory, and explicitly litigating the theory, that the memorandum of understanding itself distinctly obligated them to keep paying these checkoffs? It was litigated in a slightly different way. It did enter into the litigation, Your Honor, and I'll explain how. Midwest defended against the unilateral change allegation by arguing that the union had waived its right to bargaining over this issue. And in responding to that argument, the general counsel did refer to this 2012 MOU, and the judge, in explaining why waiver was not a viable defense, referred to the MOU and said, look at this MOU. The union not only did not waive bargaining, they believed they affirmatively had closed this issue and had essentially locked in an agreement over dues checkoff, and so there could not possibly have been a waiver. And so, yes, Your Honor, I will acknowledge... I'm responding. Go ahead. No, I will acknowledge that it wasn't as if the general counsel, you know, amended the complaint and said, ah, yes, contract modification is another theory. But it was presented at the hearing in connection with the issue of waiver, and then the judge actually made... It was presented that memorandum of understanding was introduced into the record. Or do you mean it as in this theory of liability was presented? Those are two different things. Right. I think the memorandum of understanding was introduced into the record. And this theory was not perhaps expressly litigated, but the judge made several findings about the importance of this MOU and specifically referenced... Well, that may be your problem. The judge was finding things that were not litigated. I don't see how the judge making findings saves you anything at all. Well, the judge... Our question is whether the first judge and then the board has the power consistently due process to make findings of an AULP that isn't charged in the complaint or an amended complaint. Right. But I think that sort of underlines what the presiding judge is asking. Right. If the general counsel thought it was litigating this issue, why didn't they amend the complaint to put it in there? I think the thrust of cases like Pergament and Davis Supermarkets is that you don't have to amend the complaint. There are circumstances where an issue is presented by the litigation or it's sufficiently encompassed within the complaint. What would have been the downside to moving for an amended complaint if the UC thought this was what they really did? I don't know that there would have been. It isn't good enough to say we don't have to. You didn't do it. And it doesn't look like the UC thought this was being litigated when the UC didn't make such an amendment. Well, I will say the general counsel in the position statement that she filed before the board on remand did endorse and agree that this is a contract modification. So if the concern is that the general counsel has never espoused this theory, that's not true. I would just respectfully submit that. I see that my time is about up. Before you sit down, maybe you can clear this up. As I understand it, the ALJ never made any conclusion of law about the effect of this memorandum of understanding. The ALJ's conclusions of law, which are on JA-222, said something to the effect that the violation that occurred here was the failure to continue the checkoff provision of an expired collective bargaining agreement. Correct. The MOU was not an expired collective bargaining agreement. Right. But when it gets to the board, the board drops that footnote and says, well, we don't rely on that. We don't rely on the ALJ's finding. And then the board makes a finding about the meaning of the memorandum of understanding. In between those two events, between the ALJ and the board, what kind of pleadings were filed by the general counsel and by the company dealing with the MOU? Right. Again, there were exceptions that were taken to the judge's decision, the findings that you're talking about. And in the exceptions in the brief that the company submitted in support of its exceptions, it did mention and acknowledge this MOU, and it simply stated that it was not applicable. But this was, again, as I mentioned to Judge Millett, it was in connection with this issue of waiver, whether this definitively eliminates any argument of waiver. So it was of a different tenor. But the issues were actually litigated before the board, this MOU. After the company files exceptions, does the general counsel respond? Yes. And in the response to the company's exception, did the general counsel say that the memorandum of understanding was a separate collective bargaining agreement that continued regardless of the aspiration of the other collective bargaining with respect to dues check-off? I don't think so, no, Your Honor. I don't think that that was the case. So this was then a conclusion that the board reached on its own without argument of counsel back and forth? Well, again, Your Honor, the general counsel at other stages did mention this idea that there was a contractual commitment, and it was in connection with the issue of waiver somewhat, but it was presented. I mean, I don't think the board is saying, as counsel has mentioned, that this fully and fairly litigated standard. The board is not saying that this was fully and fairly litigated. It doesn't have to. The board thinks that this was encompassed within the complaint and it was clearly presented both at the hearing and after the hearing. But not argued? Well, the general counsel did argue, as I mentioned in the position statement, that this is a contract modification. I know that my time is well over, so I will close here. The board respectfully requests a motion. Actually, sorry, I had other questions, but to go back on this one, to the extent there's a legal question about exactly what this MOU is and how it was meant to work. Was it freestanding? Was it a modification? Was it a modification with a distinct time limit from the rest of the collective bargaining agreement? That was never briefed or argued. Am I right? No, because in the board's view, this agreement on its face is quite clear. I understand, but if one thought it was not so clear, that issue, and I think they don't think it reads the same way the board does, did they ever, was this issue ever briefed? Did they ever have an opportunity to brief that issue? Did you ever have an opportunity to brief that issue? Meaning in the proceedings before the board. The issue wasn't briefed as to what this thing means and how it operates. Right. I think opportunity and actual using of that opportunity are two different things. I think the board's view is that Midwest did have an opportunity to join the terms of this specific MOU, and it's just that on its rights, essentially. And so the board does believe that this violation is well supported by the evidence. Does the board have other? On the latches question, is it the board's position that even when there's prejudice, here there were two witnesses they weren't able to call as a result of the time delay. Is it your position that they were equally responsible for the time delay, or do you acknowledge that this was the practice of the general counsel trying to consolidate complaints and dealing with a lot of matters? Did they contribute to the time delay at all? I'm not aware that they contributed to the delay before in terms of the provocation phase of this proceeding. But I will just note, Your Honor, that the board's view is that this was abandoned, and I would just like to mention because counsel talked about the position statement that was filed and acknowledged that it wasn't in the position statement. I will note that there were some new things in that position statement, such as it challenged the Section 885 cessation of dues checkoff. That was a new argument that was made in the position statement, and the due process challenge was made, and yet there was no reference to latches. Let me just get one clarification on this. Is it the board's position that latches cannot apply against the government? Yes. So none of the rest of it. If we buy that position, then nothing else matters on latches, right? That is the board's view, of course, as the board has decided. If we accept that view, then. Right, and I would just call the court's attention once again to Rutter-Wex, which is the Supreme Court case that the board cited, which does say that the board is not required to place the consequences of its own delay, even if inordinate, on wronged employees to the benefit of the wrongdoing employer. That begs the question. If the company isn't able to put on two of its witnesses and there's just not alternative evidence that they could have used, it begs the question of whether there was a wrongdoing employer. So how can that make sense? And even if that latches, is your theory that should there be evidentiary presumptions when the board causes delay against the general counsel, exclusion of the general counsel's evidence, or are courts helpless to do anything to address this prejudice? Well, under controlling precedent, it doesn't seem that there – I don't think that Midwest even has cited a case placing any particular restriction. Well, in more recent years, the Supreme Court has started to hedge a little bit on the application of latches to governmental entities. Right. But I'm even asking a separate question of if there's not latches, should there be no evidentiary consequences? Because you're impairing the employer's ability. Why not drag everything out until they can't put on a viable defense? Right. I will just mention, and this is also covered in the fourth brief, but even assuming that latches were to apply, the board's view is that Midwest wouldn't qualify for that defense. The general counsel was diligent in processing these multiple charges, sometimes concurrently, and there were deferrals to arbitration, of which Midwest is well aware, partial settlements. There was a lot going on in this litigation. Has anything deferred to arbitration or addressed in potential settlement or mediation negotiations that pertains to the oldest charges, the ones at issue here? Yes. Which you have the greatest gap in time. Yes, Your Honor. I mean, in fact, the very first charge, which ends in 038092, which actually encompassed the discrimination allegations that involved Otis Brown, that charge was found partially meritorious, partially settled, partially deferred to arbitration. So that one charge is kind of a microcosm of the issue. There are, on each of these charges, there are multiple allegations that have to be investigated and processed. They agreed to the arbitration. You said they weren't responsible, but now it sounds like you're saying they agreed to these different processes. Yes. So I do see your point that, yes, I mean, Midwest was well aware of certain reasons why the litigation went on as it did, and it participated. It participated in settling aspects of the charges. And so the board doesn't believe that this is a situation where the general counsel slumbered on his rights, which is kind of the classic situation when latches should apply. The other issue is prejudice. I will just say that, yes, the judge did acknowledge that Midwest may have suffered some prejudice. The judge did not say. Yeah, they were quite troubled by this. Right. But the ALJ didn't talk about the degree of prejudice, and I will just submit to you. Because the ALJ felt that his hands were tied. Well, that may be so, but he just accepted at face value the fact that two witnesses were unavailable to Midwest, and that that in itself is a problem. He didn't accept at face value. He actually agreed that Midwest had taken all reasonable efforts to locate Mr. Jones and hadn't been able to. Right. He didn't accept that at face value. But if you look at Mr. Jones and Mr. Saylor, Mr. Jones was already gone from the company by the time the charge involved. I understand, but it's easier to find somebody in the first year or 18 months than it is four years later. Right. That is well taken, Your Honor. But the other issue is that Mr. Jones actually did not deny. He filed a contemporaneous statement in this case, and it's in the record, and I unfortunately don't have the record citation, but he did file a response to a grievance that was filed over his unlawful statement. And in that response, he didn't deny that he made the statement. He said it may have been misunderstood. But really, there's no dispute about whether he made the statement. It's what its legal effect is, and the court can assess that. And if he had been present as a witness, he could have been examined about that, couldn't he? I'm sorry? If he had been present as a witness, he could have been examined about those things that you're saying aren't in his statement, right? Well, that's true, Your Honor. So there's not a bit of prejudice in his not being there, this statement. I think you just pled yourself out of court on that one. You can't say that this statement is any kind of substitute. It's the very lack of some specificity that illustrates just how prejudicial this was. Isn't it? Well, it's possible that he may have been able to explain what he meant by his statement. For the last few, we'd know whether that possibility was false. But his intentions would be irrelevant to the issue of whether there was a Section 8A1 violation, because the standard is a reasonable tendency to coerce. And I think that, respectfully, Your Honor, the Board is in a good position to judge that without the aid of his testimony. Without any evidence. We don't need evidence. We run their minds, right? It's an objective standard. So your position is that the content of the statement wasn't disputed? Yes. And that what he meant by it, he would have been able to testify to, but wasn't able to because of a time delay. But his intention doesn't matter because as to this coercion, it's an objective inquiry. So as long as the content of the statement isn't in dispute, there's no prejudice. Right. And as to Mr. Stahler, I mean, Midwest is quite vague about what he would have contributed. He was deceased at the time of the hearing, but Midwest suggests that he could have testified to hiring procedures. Of course, Midwest already had the testimony of one witness and a lot of documentation on that issue. And so the Board submits that it's questionable as well whether Mr. Stahler was critical to Midwest's defense, because I think that's the relevant question in regards to prejudice. The Board does not believe that lashes would apply, even if it could apply against the government, which it cannot. If the Board has no further questions, the Board will rest on its briefest to the remaining issues. Thank you. Good morning. I'm Heather Beard, and I'm Board Counsel on the case we call Midwest 2. This is a case where the Board found additional unfair labor practices following Midwest 1. And in Midwest 2, the Board found Midwest made three unlawful unilateral changes to the employee's terms and conditions of employment without bargaining and discriminated against two active union employees, Otis Brown and Dave Hubbard, for filing grievances and charges with the Board. My opponent began with Mr. Otis Brown's discharge, so I would like to begin with Mr. Brown's discharge as well. Taking a step back from all of the reasons the company is attempting to justify the discharge of Mr. Brown, what we have first is the right-line test. And under right-line, here, we have an enormous amount of animus that the general counsel demonstrated, which mostly is not challenged by Midwest, showing that the charges Mr. Brown filed and the grievances that he filed were a motivating factor in the discharge. And that animus consists of, first, the timing that this occurred, that this was seized upon, that this incident was seized upon was six weeks after he testified in Midwest 1. It was also just a couple months after he was one of the leaders of a work stoppage about the company's unilateral changes. So we have that. We also have the Dave Hubbard, which is important, although Midwest has raised any challenge to Mr. Hubbard, because the violations with regard to Mr. Hubbard that took place right before Mr. Brown was terminated involved statements made to Mr. Hubbard that paperwork was not going to be filled out by the company for him because of the fact that he had filed board charges and grievances. And then he was denied pay for work that he otherwise would have been paid under the contract and under past practice. So when you look at that, you look at the timing, and you look at the work stoppage comments that Mr. Leach made to one of the two work stoppages in the summer of 2013 that was led by Brown, the comment that I'm this far off your ass with a finger movement to Jay Victorian, we see ample animus without even getting to the disparate treatment, which I will get to. I'm sorry. Was it Jay Victorian or S. Victorian? I'm sorry. There is a Jay Victorian and there is an S. Victorian. In this instance, Jay Victorian, Jr. is the person involved in the work stoppage. And then we have a discharge of... Right. Okay. I thought it was the same person involved. Okay. Right. Okay. So once that animus is shown by the general counsel, thus that there's a motivating factor in the action taken against Mr. Brown, then the company has the burden of showing it would have taken the same exact action, discharged Mr. Brown for the Kawasaki incident, had there not been any of his protected activities. And this is where it is key that the board found the burden isn't met. And so we'll start with a few points my opponent made. First of all, he was talking about Jay Victorian and saying that this was a comparable discharge. Okay. This is the only one where we have someone who has damaged equipment that has been terminated for it. There's numerous examples in the record of multiple money that has been spent on problems. And with regard to Mr. Victorian, this is Jay Victorian, there was no question there who was responsible. And it said in the discharge notice, this is very key, that it was due to progressive discipline, the two other instances that he had had, both of which were instances that were his fault. Those were instances that were cited. However, with regard to Mr. Brown, there was nothing in the discharge, nothing from what Mr. Leach testified to, nothing that Mr. Leach said to him ever, was that this is so bad because you also have these other two instances back in the day. And my opponent has pointed out something I believe that has been correct, which is that the board didn't consider two other instances of discipline of Mr. Brown. It absolutely did. It's on page 29, the decision in order in this case, which is at JA 108, where the board did recognize there had been other instances of Mr. Brown, but there has not been, there was no at the time discussion of Mr. Brown's earlier incidents. It was so severe. 2007 and 2008? 2007, 2008, and 2012. There was two, there's a footnote on page JA 108. I thought the footnote was only about 2007 and 2008. Yes. You're right, Your Honor. But above the footnote in the actual text, the judge talks about 2012. And so, because those were not referenced, the key is, why did they say he was discharged? They said he was discharged because he caused severe damage to this. No, because he violated the company, I'm sorry, the equipment misuse or abuse policy. Right. But he didn't say the specific incident. Right. So, you're right, Your Honor. Yes, he didn't say the specific incident, but that was the reason that was given and what we testified to is because of what happened to the three Palisades and because of that initial incident report by Brown, that is why he was terminated. Never that he had had all sorts of other instances and, therefore, he's equivalent to J. Victorians in the fourth division, that when we're here in the land of the employer has to prove it would have done this anyway, it hasn't met its burden with the comparators that are in the record, nor with J. Victorians. The other factor that I think is important to point out is this issue about the, why did Mr. Brown include in his report this statement? Operator, it was due to operator error. Could have easily been because of operator error. We're not questioning Browick's testimony or anything. What we're saying is when the employer has to prove it would have done this anyway and you have an employee, we're not alleging Mr. Jones, he's management, an employee who has talked to Mr. Leach before saying put something in the report about operator error and Mr. Browick says in 23 years he's never been asked to do that. Just another piece of circumstantial evidence the company has not been able to demonstrate that it would have terminated the lead union activist and union president who had just testified against it. So that's one piece in their rebuttal burden that they have failed to meet. And I think another piece that's important is this investigation. Your Honor's discussed this a bit with my opposing counsel. Yes, there were 12 other reports after the first report. And those reports took place throughout, this incident occurred in September of 2013. And Browick continued to do reports all throughout October. And as a brief, as we make the point in our brief, throughout October, Mr. Brown, yes, he was discharged October 1st, but he's going through a grievance process whereby at each stage he's saying don't terminate me, don't terminate me. And what the company has failed to explain is why as there's other reports that Browick is filling out, are those not considered? They're not talking to Browick throughout the entirety, and I believe it is in our brief. At one of the grievance meetings, Mr. Brown's position is the union wants me to be reinstated, and the company says, Mr. Leach says that's not going to happen. So the board's position is that given that the company has not met its burden here of showing that had Mr. Brown not engaged in a plethora of protected activity and grievances, that they would have taken the same action. And the board's finding on that is supported by substantial evidence. So now I'd like to talk about the aluminum and calcium. First of all, with regard to the aluminum, the board's finding is that regardless of the interpretation of Judge Santel or Judge Millett about what does a forklift do in terms of loading for purposes of the aluminum, regardless, the plain language of the 10-K decision does not speak to work that involves taking forklifts and moving them to the dry side. And when the graven of this violation is that work of loading either trucks, either forklifts, loading the aluminum has been taken away from the ILA employees, there is a bargaining obligation that the employer has. So there's no doubt that there has been work taken away from ILA and that that is a mandatory subject of bargaining. They say the history, the whole history was before the board in that proceeding and it included forklift loading as well as truck loading. Well, I understand that, Judge Millett, but the conclusion in the board's 10-K determination is that they are going to award it consistent with past practice, which took into account the testimony and everything that happened in the 10-K. And when awarding it with past practice, as the board found here, and the company was able to put on its witnesses and showed absolutely no prejudice from not being able to include that 10-K hearing. Here, in this hearing, there were a multitude of witnesses that were able to say Teamsters were not taking their forklifts and driving them over to the wet side prior to this, what happened in the summer of 2013. We don't have to decide, contrary to all the construction people I ever knew, that when you pick something up with a forklift, you are committing an act of loading, if you would. Even if you're not, you're still changing the way that load gets carried from the wet side to the dry side. That was the locals' work before and becomes the Teamsters' work by the change in methodology. Well, I would say it doesn't become the Teamsters' work without the company bargaining because the mandatory subject is- No, I'm not- I think we're missing each other in the middle on that. I'm not suggesting that the company had a right to change it to the Teamsters' work. Okay. I'm suggesting, perhaps, that they didn't have such a right. Correct. Whether you call that loading or not loading. The work of getting the aluminum off the ground in the wet side has been the work of the locals. Correct. The Teamsters may have taken it over when it got across in the warehouse or whatever. I don't know what they did there. That doesn't matter. They're changing the act of getting it across. Whether you call it loading or something else. Right. I agree with you, Your Honor. Thank you. And I do believe that there's other evidence that the past practice was not the reason why the forklifts were sent over. I believe Mr. Leach himself even said the reason, and that's why the two work stoppages were so heated. He said, the 10K allows us to do this. The 10K allows us to do this. So, it's not a situation where we had years and years and years of the same thing having happened. The forklift having been used from the Teamsters. So, I think that we've established there was a past practice. There was some evidence that maybe from 2005 to 2006, on occasion, a forklift had maybe come from the Teamsters' side. But that's all. And that's not sufficient to demonstrate that there had been a past practice. And that also informed the judge's evidentiary finding, which was well taken, that there was no need for there to be hearsay testimony from a Teamsters individual, Mr. J., who had recently just become a Teamsters steward, to say that others had told him that in the past there had been forklifts coming over. So, there was nothing to indicate any sort of prejudice from his testimony not being taken, given that there was not evidence that this little period was one to constitute a past practice. So, with regard to the calcium, I see my time is up. If I could just have one minute to rebut his calcium. I want to ask you something about seat time, too, but go ahead. Sure. Okay, we'll get to seat time. As regards to calcium, our position, the board's position, is not that somehow it violates the 10K for what happened with calcium. The board's position is very simple, which is, with forklifts, it was taking the ILA's work with loading. With calcium, it's taking away their work of unloading, because they were storing the calcium before, significantly on the wet side, which is where the ILA folks would unload it. And in November 2013, it's undisputed, they started storing the calcium on the dry side. And that took, again, the work away from the ILA folks, which is the change. And so, yes, seat time. I just want to ask you, quickly, very simply making the argument that they had to eliminate seat time training because OSHA regulations, Port Authority requirements, obligated them only to allow certified folks into the caps of these cranes. But as I read the OSHA regulation section F1, it does provide for operator and training to be inside the crane, as long as there's sufficient supervision for the supervision requirements. So I want to make sure I understand the board's position on this. Because there was a legal way to continue seat training consistent with OSHA regulations, that's what they were supposed to negotiate? Because sometimes it reads like and sounds like in the briefing that they had to, whatever the law required, they still had to negotiate. Right. So is it the former or the latter? It's the former. Now, there was no, we didn't rely on OSHA regulations here. What we were doing is taking a look at what the employer was arguing is to say we didn't have to bargain over seat time. And they said it's because in 2010 and 2011, the Port Authority said you can't have operators of cranes who haven't had the certification. And the violation is sort of what you outlined with regard to OSHA. There is nothing in what the Port Authority said or in any regulation that was at issue here that would prevent training, someone to sit up in there and be trained while the crane was being operated. And so because nothing legally precluded them from doing it, there was a bargaining obligation when they decided to discontinue. The position is not that regardless of what the Port Authority or OSHA regulations might require, you still have to negotiate. Right. Stop doing something that is, I get this case is complicated. But if you had a situation where Congress passes a law that says nobody inside a crane who is not already certified, period, full stop. Right. That would definitely be a different case here. Well, the position here wouldn't suggest that they didn't have to negotiate about allowing people in there to violate the law. That's an illegal subject. Right. I would say if it's an illegal subject of bargaining, of course, they wouldn't have to bargain over it. But to the extent that there could be discussions, since their past practice had always been something different, there may have been, and this isn't that case, but there may still be something that would be an obligation for them to bargain over or affect bargaining, something like that. Change in training program. Right, exactly. Okay. I just wanted to make sure because it wasn't so clear in the briefing. Sorry. To me, I should say it wasn't so clear to me. Okay. My time's up. All right. Thank you. May it please the Court, Rebecca Johnson. I will be talking about what we have called Midwest III. This case picks up shortly after the unfair labor practice violations found in Midwest II. In April of 2014, Midwest added two individuals to its skill list of employees, which determines how much they work, and in doing so violated Section 85, 3, and 1 of the Act. The Board's findings in this regard are amply supported by the record evidence, especially including as well foreign credibility findings. The Board found two separate 885 violations with respect to the Midwest adding two individuals to the skill list in April of 2014. To start, Midwest unilaterally departed from the contract selection criteria. Under the party's collective bargaining agreement, an individual must possess four out of five qualifications to be added to the skill list. Midwest, however, added an individual, Joe Victorian, Jr., who had only three of the qualifications. At argument just now, Midwest claims that he had four, but the judge and the Board looked at the documentary evidence, which is all the orders of call in the record, and found that, in fact, he only had three qualifications listed on those orders of call. Midwest made a new argument just now that in order to be a crane operator, he necessarily had to also be qualified as a signal person. It did not make this argument in its briefing, and the judge found otherwise. With respect to departing from the contractual selection criteria, Midwest also departed from another provision of the contract whereby it needed to follow seniority. With two individuals of relatively equal qualifications, seniority was supposed to control. The Board concedes that Mr. Canales was qualified for the skill list. Nevertheless, Mr. Russell was passed over, who had the most seniority, and also Mr. F. Victorian, Jr. was also passed over, who had less seniority than Canales but more seniority than Joe Victorian, Jr. Midwest again tries to challenge the qualifications of the people that it passed over, Mr. Russell and Mr. F. Victorian, Jr. As we point out in our brief, these are amply supported by substantial evidence, particularly the judge's credibility findings. The judge credited the human resources director, Blakely, over that of operations manager, Mr. Leach, who the Board found was unusually unreliable. Turning to the second Section 885 violation, Midwest also unilaterally departed from its past practice of meeting with the union to discuss skill list additions before putting people on the list. There is ample record evidence of this past practice, most importantly in the 2012 Human Resources Memorandum, in which human resources manager, Blakely, explicitly admits to the past practice. In its reply brief, Midwest readily admits that this memo refers to the past practice. And in the record, in addition to this memo, we have Blakely's testimony, we have Brown's testimony, we also have testimony from Leach, who, after being impeached with testimony from another hearing, grudgingly admitted to the past practice. And it's uncontested that Midwest added these two individuals without discussing with the union first. What does meet and confer entail? It seems like a whole range of activities here. Typically, they would just discuss and get input from the union before adding individuals to the list. It wasn't sitting down at a table and bargaining, necessarily. Could meet and confer just mean emailing over here our proposed additions to the list just to give them notice? No, it went beyond just notice. It went to discussions and seeking input from the union before adding people to the list. Turning finally to the discrimination violation, which is also well supported by the record evidence, F. Victorian Jr. was especially active in the union. He was elected union steward. He filed grievances. He challenged contract issues. And in particular, he was involved in a work stoppage over a jurisdictional dispute. During this work stoppage, he confronted Mr. Leach, and Leach responded to his protected activity by holding his fingers out and saying, I'm about this far off your ass. The board and the judge relied on this statement as evidence of anti-union animus. I'm wondering if that statement, at least by itself, would be evidence of anti-union animus. I mean, it obviously indicates an animosity for the person whose IQ is about that far off, but it doesn't necessarily mean the union. You may have disliked him for any number of reasons. The board drew the inference that that statement was in response to his protected activity, although it wasn't flagged. That's a bit circuitous. You were using it to show animosity, and now you're saying that they drew their inference because of his animosity. They drew the inference that it was evidence of animus. But in addition to that statement, we also have what the majority of the board relied on, which are the contemporaneous unfair labor practices in Midwest I and Midwest II, and the board used those as background evidence of animus. And finally, the employer was unable to meet his affirmative defense, as the judge and the board found that Victorian Jr. was qualified for the skill test, so it's a claim that he is not supported. Thank you. How much time do we have? You wanted a little more than that, I think. Please, I would greatly appreciate it. We'll give you five minutes. Okay, thank you, Your Honor. I'll start with Midwest III. First, in regards to the credibility findings, Mr. Russell indicated that he was a qualified hatch leader. He had been hired once in 2009, and that made him a qualified hatch leader. As indicated in our brief, we spent four pages outlining all the times Mr. Russell lied under oath. And A.L.J. Bogus even admitted that he was not a trustworthy witness. So this is a credibility determination you're asking us to carry? Correct. At that time... Do you have any cases where we've actually overturned a credibility determination? No, I've never written a brief where I've spent four pages outlining a witness lying under oath, admittedly lying under oath, and the A.L.J. saying he's not trustworthy. But... We have a case law that when there's two untrustworthy witnesses, which is sort of your point, A.L.J. gets to choose between them. Oh, and he no doubt picked the one that I would expect him to choose, right? No, but they're both untrustworthy. I guess I'm not quite understanding how it helps to lay out that Mr. Russell is untrustworthy. I find it odd that Mr. Leach gives false every testimony, but Mr. Russell doesn't. The whole process, it's... You do understand the standard of review, though. Correct. Helplessly incredible and self-contradicting. I think four pages of lying under oath, lying on affidavit. You do understand that he's having to choose between unreliable witnesses, and he gets to do it. Yeah, I understand. He doesn't have the right nor the duty to do it. I understood, Your Honor. I guess that's something we'll have to try to change at a later date. As far as bargaining, meet and confer. She admitted meet and confer is not bargaining. But, yet, we've been hit with a violation of Day 1 advice. We could have stopped meeting and conferring without bargaining about meeting and conferring. We do not meet and confer with the union over the skilled list. We do not meet and confer. Otis Brown, the very first case, Midwest One. The fact finding now that you're... Just to be clear, so now we're... Correct, we're going back to fact finding. ALJ correctly stated that company decides when people go on the skilled list. So, what are we meeting and conferring about? We don't meet and confer. They're not inconsistent at all. We do not meet and confer. I will meet and confer with my kids before I make a decision. We don't know why I make the decision. And we don't do that. The only thing they ask the union... I want to get back. You just quoted that statement. Do you see how that doesn't matter here nor there with whether you meet and confer before you put the folks on the list? So, okay, but what I'm saying is what does meet and confer mean? We want Otis on the list. We don't, so that's it? What is the process there? Are we supposed to bargain about people's qualifications? They're either qualified or they're not qualified. There's nothing to meet and confer about. Who determined that you had to have skills in these five areas? Was that part of the collective bargaining agreement? That was part of the collective bargaining agreement. Let me ask you since I've raised that subject. This goes back to the Midwest War and the dues checkoff. The memorandum of understanding was valid only until a new collective bargaining agreement was signed. When, if ever, has a new collective bargaining agreement been reached between the employer and the union? We do not, we have not yet and do not have a new agreement with the union. But Section 8D, even if you go under a midterm modification theory, Section 8D does not state an agreement without clear jurisdictional language doesn't live in perpetuity. So the situation now is that it's a continuation of the terms of the old agreement? It was until the employees decertified the union in January of 2018. They decertified? Correct. I'm sorry. We received a petition. We were through recognition. Okay. So we had more than 50%. So we filed, we, both the company and the union submitted letters stating that the contract was being terminated. So the MOU was also terminated under 8D. It was timely. With respect to dues checkoff again. Wait, you're saying you satisfied 8D? Correct. Where did you, prior to termination, first you were supposed to wait 60 days, you didn't wait 60 days. Did you know the problem? We, we. Under 8D you're supposed to wait 60 days. We filed our termination agreement on October 3rd. We filed termination with the union on October 3rd. Sorry. Okay, and then when did you stop? When we stopped deducting dues was January 2013. January 18th? I believe so. January 18th, 13th, somewhere around there. Does that make 60 days? Does that make 60 days? I thought it was later in October. Yeah. I think you were before 60 days. Correct. October, November, December. So we're right around 90 days. I thought it was November, but the. When we stopped deducting dues or when we said we weren't? No, the notice. Okay. No, we terminated, we terminated the contract on October 3rd. We terminated the contract on October 3rd. When did you actually say we were stopping the collection? We stopped. We said we were going to stop dues on November 19th, I believe. November 19th. November 19th, 13th, and I think somewhere around there. Now, did you have 60 days from that November 19th date until you actually started, started not deducting? No, because I believe. I believe. So you're short about a week, aren't you? Correct. A couple weeks. A couple weeks. Correct. Did you notify the Federal Mediation Service as 8D requires? Excuse me? Did you notify the Federal Mediation Service as 8D requires? I believe there was. I'm not sure. I believe there was, but it's not part of the record and I can't answer that. Did you offer to bargain over continuing the dues checkoff? Because I read your, your, your notice to the, to the attorney, to, to, to the union. It just said we're going to do this. It didn't offer to bargain. I'm just. You said you complied with 8D and I'm going to do the other elements. The union, the union claims that they never. The union claims that they. I said I'm asking. I understand what you're asking. All right. Then my question is, on the document where you said we gave notice that we're not going to continue the checkoff, and then you stood here and said that satisfied 8D, where in the text of that document do you offer to bargain over that? On, on November 19th, we're still operating under old Bethlehem Steel, so we don't have to bargain over that. If that, that's basically, that, that's a different question from whether you had complied with 8D. 8D. 8D has four elements. Correct. And I'm saying if, if we did not, if the termination of the notice of saying November 13th, then by in and of itself, then no, we missed it by a few weeks. I mean, I'm not going to sit up here and say that we, we complied with 60 days if we were two weeks short. What I'm saying is we terminated the contract on October 3rd. So, the agreement had expired. It was over. Back to the dues and the MOU. The MOU was never introduced at trial with respect to a waiver argument. It wasn't. The MOU was introduced at trial over the issue of whether or not the parties executed and came to an agreement on a successor agreement. It was literally one page of testimony on that issue. But you do have an ALJ finding, right? You have an ALJ finding that the parties affirmed their commitment to the continuation of a new dues checkoff provision until a successor legal agreement was reached. Yes, and he made that without any argument. No, but I'm, I'm, I'm, I understand that argument. But this is the ALJ, so you've still gone up to the board. I'm sorry, were you not on notice at that point that the board was making this, that the ALJ had made this finding about what that MOU meant? No. So, you're on plenty of notice to argue about that, to take exception, I assume you took exception to that sentence. We took exception to the sentence with respect to our waiver argument. You didn't accept to it as to its description of what the MOU was. No, because he said that we, he, he did not make his ruling that we violated the act with respect to succession of dues checkoffs based upon that MOU. He based it upon WKYC, it's crystal clear what he made his decision on. Had we not accepted to that, then we waive, we waive our waiver argument. So, I mean, it's a catch-22. Yeah, we have to, we have to raise it. Aside from due process, what's your argument against the application of the memorandum of understanding? Other than due process and not knowing that it was actually being litigated? Right. The fact that we put no evidence on whatsoever. No, no, no. Put aside the procedural question. What's your substantive answer to the language of the MOU which says that you're going to continue dues checkoff until a new? The substantive answer is it was an amendment to the contract, and the contract expired and was terminated. But the MOU, it said, this will, we'll keep doing this until a new collective bargaining agreement is reached. Correct. There's, there's, there's no, there's no durational language, but you're still allowed to terminate a durational language agreement. If, if this were the case, if, if, if people could have documents that could live in perpetuity, we would have these all over the place. And we don't. Okay. All right. Thank you very much. Thank you. The case is submitted.
judges: Millett, Sentelle, Randolph